Todd D. Carpenter (SBN 234464)
*todd@lcllp.com*
Scott G. Braden (SBN 305051)
*scott@lcllp.com*
James B. Drimmer (SBN 196890)
*jim@lcllp.com*
Ethan Ames (SBN 339027)
*ethan@lcllp.com*
Christopher L. Cornelius (*pro hac vice* forthcoming)
*chris@lcllp.com*
**LYNCH CARPENTER, LLP**
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
Tel.: 619.762.1910

*Counsel for Plaintiffs*
*and the Proposed Class*

**LYNCH CARPENTER**
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

QASEM HASHIMI and HENRY DE LA PAZ, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

PVH CORP. a Delaware corporation, PVH RETAIL STORES, LLC, a Delaware limited liability company, and DOES 1-50, inclusive,

Defendants.

Case No.: 3:26-cv-03811-AJB-GC

**FIRST AMENDED CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiffs Qasem Hashimi and Henry De La Paz (collectively, "Plaintiffs") bring this action, on behalf of themselves and all others similarly situated, against Defendant PVH Corp. and PVH Retail Stores, LLC (collectively, "Tommy Hilfiger" or "Defendants") and state:

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

## I. NATURE OF ACTION

1. This case arises from Defendants' illegal false price-discounting scheme implemented at their brick-and-mortar outlet stores. False price-discounting occurs when a seller fabricates an inflated reference price, at which it seldom, if ever, sells a product, while offering the product "on sale" at what appears to be a significantly discounted price. In reality, there is no discount or savings because the reference price significantly overstates the product's value, as the product is almost always sold at prices below the reference price and, often, below the "sale" price. "It has long been considered a deceptive practice to state falsely that a product ordinarily sells for an inflated price but that it is being offered at a special reduced price[.]" *F.T.C. v. Colgate-Palmolive Co.*, 380 U.S. 374, 387 & n.17 (1965) (collecting cases).

2. Prices reflect both quality and value.[1] Retailers like Defendants therefore use inflated reference prices to manipulate the public's perception of their merchandise, misleading consumers into overestimating a product's quality and value and leading them to believe they are getting a bargain and higher-quality product when buying at a "sale" price. As a result, false price-discounting artificially inflates demand for a product, which, in turn, artificially inflates prices.[2] Specifically, "the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." Richard Staelin, *et al.*, *Competition and the Regulation of Fictitious Pricing*, 87 J. Mktg., 826, 835 (2023). Consequently,

[1] Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. Pub. Pol'y & Mktg. 52, 55 (1992) [hereinafter Grewal & Compeau, *Comparative Price Advertising*] ("[P]rice is materially utilized in the formation of perceptions of the product's value and influences the decision to purchase the product or to continue to search for a lower price."); Patrick J. Kaufmann et al., *Deception in Retailer High-Low Pricing: A "Rule of Reason" Approach*, 70 J. Retailing 115, 118 (1994) ("[R]eference to a retailer's normal or regular price in retail sale price advertising provides the consumer with information used to determine perceived value").

[2] Grewal & Compeau, *Comparative Price Advertising*, *supra* note 1, at 55 ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product.").

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

false price-discounting schemes enable retailers to sell more products and charge higher prices than they otherwise would without the false price comparisons.

3. Based on their counsel's pre-suit investigation, Plaintiffs allege that Defendants seek to capitalize on these known and proven effects of false price comparisons by advertising perpetual (or near perpetual) discounts from false reference prices to entice consumers into buying products that they would not otherwise purchase and/or to pay more than they otherwise would, absent the false discounts. At all relevant times, Defendants have continually engaged in false price-discounting for men and women's clothing and accessories sold throughout their brick-and-mortar stores, including within California. In bringing this putative First Amended Class Action Complaint, Plaintiffs seek to remedy this deception and its attendant harm to consumers. Plaintiffs seek all applicable damages, including actual, statutory, and punitive damages as well as equitable restitution and injunctive relief from Defendants arising from their false price-discounting practices.

4. Through their false price-discounting scheme alleged herein, Defendants violated, and continue to violate, California consumer protection statutes and federal law. Specifically, Defendants violated and continue to violate California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*. (UCL"); California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.* ("FAL"); California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* ("CLRA"); and the Federal Trade Commission ("FTC") Act ("FTCA"), which prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)).

## II. PARTIES

**Plaintiff Henry De La Paz**

5. Plaintiff De La Paz resides in North Hills, California, and is a citizen of the State of California. On or about July 26, 2024, Plaintiff De La Paz went shopping for some new clothing at the Tommy Hilfiger outlet store located at 100 Citadel Drive, Suite 519, Commerce, California 90040. In reliance on Defendants' false and deceptive

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

advertising, marketing, and discount pricing scheme, Plaintiff De La Paz purchased a t-shirt that bore an "original" (reference) price of approximately $24.50 and a purported 25%-off discount (-$11.27)—in addition to a 10% off total purchase discount—for an actual sales price of approximately $13.23. Plaintiff De La Paz also purchased a polo shirt that bore an "original" (reference) price of approximately $69.50 and a purported sale price of $39.99—minus the 10% off total purchase price discount—for an actual sales price of approximately $35.99. Plaintiff De La Paz paid an after-tax total of $54.27.

6. During his time at the Tommy Hilfiger outlet store on July 26, 2024, Plaintiff De La Paz browsed the store and observed numerous signs advertising storewide markdowns and percentage-based discounts. After reviewing the advertised "original" and sale prices on the items he selected, he reasonably believed he was receiving a substantial bargain. This belief was material to his decision to purchase.

7. Plaintiff De La Paz would not have purchased either item, or would not have paid as much as he did, had he known the advertised discounts were false. He believed the items had been previously offered at the higher reference price and were now being sold at a genuine markdown. In fact, he did not receive the benefit of any real discount and ultimately paid more than the fair value of the products under the mistaken impression that he was securing a deal.

8. What's more, Defendants' signage and labeling deceived Plaintiff De La Paz into believing that he was purchasing mainline Tommy Hilfiger merchandise at a discount. In reality, the items he purchased appear to have been manufactured specifically for sale in Defendants' factory outlet stores ("MFO") and as a result—Plaintiffs are informed and believe—they have not ever been offered elsewhere. Thus, the "original" $24.50 and $69.50 prices were not markdowns from any higher full-price

mainline item, but rather a fictitious reference price deceptively used to create a false sense of savings and urgency among consumers.[3]

9. Accordingly, Plaintiff De La Paz has suffered economic injury as a direct result of Defendants' unfair and deceptive false discounting practices, including the inflated price paid for merchandise falsely presented as discounted goods.

**Plaintiff Qasem Hashimi**

10. Plaintiff Hashimi resides in San Diego, California, and is a citizen of the State of California. On or about April 9, 2025, Plaintiff Hashimi went shopping for some new clothing at the Tommy Hilfiger outlet store located at 5620 Paseo Del Norte, Carlsbad, California 92008. In reliance on Defendants' false and deceptive advertising, marketing, and discount pricing scheme, Plaintiff Hashimi purchased sweatpants that bore an "original" (reference) price of approximately $80.00 and a purported 50%-off discount (-$40.00) for an actual sales price of approximately $40.00. Plaintiff Hashimi also purchased a polo shirt that bore an "original" (reference) price of approximately $64.50 and a purported and actual sale price of $28.00. Plaintiff Hashimi paid an after-tax total of $73.22.

11. During his time at the Tommy Hilfiger outlet store on April 9, 2025, Plaintiff Hashimi browsed the store and observed numerous signs advertising storewide markdowns and percentage-based discounts. After reviewing the advertised "original" and sale prices on the items he selected, he reasonably believed he was receiving a substantial bargain. This belief was material to his decision to purchase.

12. Plaintiff Hashimi would not have purchased either item, or would not have paid as much as he did, had he known the advertised discounts were false. He believed the items had been previously offered at the higher reference price and were now being sold at a genuine markdown. In fact, he did not receive the benefit of any real discount

[3] Plaintiff De La Paz reserves the right to submit additional support—including product research, style code analyses, and SKU comparison data—in connection with future amended complaints or briefing once the Court has allowed discovery to open on these purchases.

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

and ultimately paid more than the fair value of the products under the mistaken impression that he was securing a deal.

13. What's more, Defendants' signage and labeling deceived Plaintiff Hashimi into believing that he was purchasing mainline Tommy Hilfiger merchandise at a discount. In reality, like Plaintiff De La Paz's items, the items he purchased appear to have been manufactured specifically for sale in Defendants' factory outlet stores (*i.e.*, MFO) and as a result—Plaintiffs are informed and believe—they have not ever been offered elsewhere. Thus, the "original" $80 and $64.50 prices were not markdowns from any higher full-price mainline item, but rather a fictitious reference price deceptively used to create a false sense of savings and urgency among consumers.[4]

14. Accordingly, Plaintiff De La Paz has suffered economic injury as a direct result of Defendants' unfair and deceptive false discounting practices, including the inflated price paid for merchandise falsely presented as discounted goods.

**<u>Defendants</u>**

15. Defendant PVH, Corp., is a Delaware corporation with its principal executive offices in New York, New York. Defendant PVH Retail Stores, LLC, is a Delaware limited liability company with its principal executive offices in New York, New York. Defendants PVH, Corp., and PVH Retail Stores, LLC, are citizens of the State of Delaware and the State of New York. Plaintiffs are informed and believe that Defendants own and operate Tommy Hilfiger outlet stores in California, in addition to other states across the United States, and advertise, market, distribute, and/or sell Tommy Hilfiger-brand clothing and accessories in California, and throughout the United States.

---

[4] Plaintiff Hashimi reserves the right to submit additional support—including product research, style code analyses, and SKU comparison data—in connection with future amended complaints or briefing once the Court has allowed discovery to open on these purchases.

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

16. Plaintiffs do not know the true names or capacities of the persons or entities sued herein as Does 1-50 inclusive and therefore sue such defendants by such fictitious names. Plaintiffs are informed and believe, and upon such information and belief allege, that each of the Doe defendants is, in some manner, legally responsible for the damages suffered by Plaintiffs and members of the proposed Class as alleged herein. Plaintiffs will amend this First Amended Class Action Complaint to set forth the true names and capacities of these defendants when they have been ascertained, along with appropriate charging allegations, as may be necessary.

17. Defendants are fully aware that their reference price advertising is false, deceptive, misleading, and unlawful under California and federal law—and yet continue to engage in this pricing scheme with calculated disregard for consumer protection standards.

18. Defendants knowingly and fraudulently concealed from Plaintiffs and members of the proposed Class the truth about their fictitious reference prices and the misleading nature of their advertised discounts. They also failed to disclose the materially inferior, MFO nature of the products sold at Tommy Hilfiger outlet locations, depriving consumers of the ability to make informed purchasing decisions.

19. Defendants deliberately withheld and misrepresented critical information about their false former pricing practices for the specific purpose of inducing Plaintiffs and Class members to purchase Tommy Hilfiger outlet merchandise under the false impression they were receiving a legitimate discount on mainline-quality goods.

20. At all relevant times, Defendants had a legal and equitable duty to disclose the truth about their deceptive pricing scheme and the genuine nature of their outlet merchandise. Defendants breached that duty by intentionally omitting material facts and misleading consumers at the point of sale.

## III. JURISDICTION AND VENUE

21. This Court has original jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The matter in

controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000, and Plaintiffs, as well as at least some members of the proposed Class (defined below), have different states of citizenship from the Defendants.

22. This Court has personal jurisdiction over Defendants because Defendants conduct substantial business in California, including by operating brick-and-mortar outlet stores and selling products to consumers within this District.

23. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## IV. General Allegations

### A. Retailers Benefit from False Reference Pricing Schemes

24. For nearly 50 years, the FTC invested significant resources in deterring the use of false reference pricing, so much so that in the 1950s, as much as 30% of the FTC's cease-and-desist orders in a typical year were related to false price discounting. *See* Staelin, *et al., supra*, at 826. Despite these efforts, in 1970, the FTC decided to cease aggressive enforcement of its published guidelines and regulations aimed at preventing the use of false reference prices. *Id*. The reason for the FTC's shift in enforcement policies was due to the need to regulate what it believed were more egregious actions, and the FTC's belief that the practice of using false reference prices would dissipate as competition increased. Decades later, with the benefit of hindsight, economists have now concluded that the FTC's prediction was incorrect, and that its lax enforcement policies have backfired, as "fictitious pricing within the United States has . . . proliferated, is prevalent, and is pervasive. . . . as many firms consistently ignor[e] fictitious pricing statutes with impunity." *Id*. (cleaned up).

25. This does not come without consumer harm and consequences, as retailers like Defendants benefit substantially from false discounting schemes because consumers use advertised reference prices to make purchasing decisions, particularly

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

when the information available to consumers varies among different types of products.[5] Most often, as with men and women's clothing and accessories, consumers lack complete information about the products, and as a result, they often rely on information provided by sellers, including pricing information, to make purchase decisions.[6]

26. Deceptively advertised reference prices are thus incorporated into consumers' decision process. First, a product's price is an indicator of product quality;[7] as such, consumers view inflated and false reference prices as a proxy for product quality. Second, reference prices appeal to consumers' desire for bargains or deals.[8] Academic researchers note how consumers "sometimes expend more time and energy to get a discount than seems reasonable given the financial gain involved," and "often derive more satisfaction from finding a sale price than might be expected on the basis of the amount of money they actually save."[9] Under this concept, coined as "transaction utility" by Nobel Prize-winning economist Richard Thaler, consumers place value on the psychological experience of obtaining a product at a perceived bargain.[10]

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

[5] Even within a product, consumers may have imperfect information on the individual attributes. Economists describe "search goods" as those whose attributes "can be ascertained in the search process prior to purchase" (*e.g.*, style of a shirt), "experience goods" as those whose attributes "can be discovered only after purchase as the product is used" (*e.g.*, longevity of a shirt), and "credence goods" as those whose attributes "cannot be evaluated in normal use" (*e.g.*, whether the shirt's cotton was produced using organic farming methods). Michael R. Darby & Edi Karni. *Free Competition and the Optimal Amount of Fraud*, 16 no. 1 J. Law & Econ. 67, 68-69 (1973).

[6] "Not only do consumers lack full information about the prices of goods, but their information is probably even poorer about the quality variation of products simply because the latter information is more difficult to obtain". Phillip Nelson. *Information and Consumer Behavior*. 78 no. 2 J. Pol. Econ. 311, 311-12 (1970).

[7] Grewal & Compeau, *Comparative Price Advertising*, *supra* note 1, at 54; *see also* Richard Thaler. *Mental Accounting and Consumer Choice*, 4 no. 3 Mktg. Sci. 199, 212 (1985) [hereinafter Thaler, *Mental Accounting and Consumer Choice*] ("The [reference price] will be more successful as a reference price the less often the good is purchased. The [reference price] is most likely to serve as a proxy for quality when the consumer has trouble determining quality in other ways (such as by inspection").

[8] Grewal & Compeau, *Comparative Price Advertising*, *supra* note 1, at 52.

[9] Peter Darke & Darren Dahl. *Fairness and Discounts: The Subjective Value of a Bargain*, 13 no. 3 J. of Consumer Psych. 328 (2003).

[10] *See* Staelin, *et al.*, *supra*, at 826 ("It is now well accepted that many consumers get extra utility, beyond that associated with consuming a product from purchasing it on

27. Academic literature further reports that "there is ample evidence that consumers use reference prices in making brand choices"[11] and publications have summarized the empirical data as follows:

> Inflated reference prices can have multiple effects on consumers. They can increase consumers' value perceptions (transaction value and acquisition value), reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products … Inflated and/or false advertised reference prices enhance consumers' internal reference price estimates and, ultimately, increase their perceptions of value and likelihood to purchase[.][12]

28. In the academic article *Competition and the Regulation of Fictitious Pricing*, published in 2023, authors Richard Staelin, a Duke marketing professor since 1982, Joel Urbany, a Notre Dame marketing professor since 1999, and Donald Ngwe, a senior principal economist for Microsoft and former marketing professor for Harvard, built on their prior analytic work to explain the effects of false reference pricing schemes and why their use has not dissipated as previously expected by the FTC. *See* Staelin, *et al.*, *supra*, at 826-27.

29. As Staelin and his co-authors explain, the proliferation of false price-discounting can be attributed to several factors, including the absence of FTC's enforcement of its false price-discounting regulations, the modern development of consumer search behavior and options available to consumers (*e.g.*, smartphones, online shopping), which has amplified the ease and effectiveness of false price-discounting, and the incorrect assumption that competition would naturally push

---

deal [] and that magnitude of this utility is a function of the size of the deal.") (citation omitted).

[11] Gurumurthy Kalvanaram & Russell S. Winer. *Empirical Generalizations from Reference Price Research*. 14 no. 3 Mktg. Sci. G161 (1995); *see also* Jerry B. Gotlieb & Cyndy Thomas Fitzgerald. *An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product*. 6 no. 1 J. of Applied Bus. Rsch. 59, 65-66 (1990) [hereinafter Gotlieb & Fitzgerald, *An Investigation*] ("The results of this research provide support for the position that [external] reference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product.").

[12] Dhruv Grewal & Larry D. Compeau, *Pricing and Public Policy: A Research Agenda and an Overview of the Special Issue*, 18 no. 1 J. Pub. Pol'y & Mktg. 3, 7 (1999).

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

deceptive pricing out of the market by motivating sellers to provide truthful information. *See id.* at 829-834. In reality, heightened competition drove firms to differentiate through "noise" (*i.e.*, misleading information); thus, the authors conclude that competition *spread* the practice of false price-discounting, rather than extinguish it. *See id.* at 831 ("Identical firms selling identical products make positive profits because of their obfuscation strategy, and the likelihood of obfuscation grows as competition intensifies.").[13]

30. Consequently, retailers like Defendants, who understand that consumers are susceptible to bargain hunting, have a substantial financial interest in making consumers think they are getting a bargain, even when they are not. Contrary to the illusory bargains in Defendants' advertisements, consumers are not paying less than the true normal price, (or AUR), and therefore are not receiving any discount. Rather, they are actually overpaying for Defendants' product as "the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." Staelin, *et al.*, *supra*, at 835. In short, "recent empirical evidence suggests that fictitious pricing can produce significant positive returns for [retailers, but also] lead[s] to consumer welfare loss." *Id.* at 827.

**B. Defendants Engage in a Fraudulent Price Discounting Scheme**

31. Defendants, a specialty retailer of men and women's clothing and accessories, have for years engaged in a deceptive pricing scheme at their Tommy

[13] The author's proposed solution to curbing false price-discounting is the disclosure of the "true normal price." The "true normal price" refers to the price at which a product is ordinarily sold (such as a historical or modal selling price), serving as a clear and standardized benchmark which consumers can use to reliably assess what a product typically sells for and, in turn, whether a discount is *bona fide*. *See id.* at 842 ("[W]e believe the most effective metric to capture normal price is a firm's modal offering price in the most recent, relevant business period.") (citing 16 C.F.R § 233.1). Nearly all retailers internally track this metric and typically refer to it as the "Average Unit Retail" (AUR). *See Average Unit Retail (AUR): Meaning, Importance, & Formula*, 8th & Walton (Sep. 28, 2023), https://www.8thandwalton.com/blog/average-unit-retail//. ("AUR (Average Unit Retail) is the average selling price of an item within a specific period."). Retailers also track and project other metrics that provide additional context regarding what products typically sell for, and what they expect to sell for in the future, such as sales and margin projections.

Hilfiger outlet stores located in California. This scheme involves advertising merchandise at purported "sale" prices that are falsely represented as discounts from inflated "original" prices printed on the products' price tags. In most instances, these items are accompanied by placards in the immediate vicinity advertising a certain percentage-off discount from the stated "original" price. In other cases, signage presents a whole-price reduction (*e.g.*, "Now $XX.XX") from that same reference price.

32. These signs—uniformly printed on colored card stock with bold, white font—appear throughout Tommy Hilfiger outlet stores. Defendants do not disclose when any item was last offered, if ever, at its "original" price.

33. Photographs of Defendants' stores reveal the systematic nature of this practice:







LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910








LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910












34. As shown in those photographs, Defendants' "original" or "ticket" prices include no qualifying language suggesting a price comparison to other markets. Instead, Defendants' pervasive use of percentage-off and "Now" pricing signage

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

creates the unmistakable impression that the advertised discounts reflect reductions from a bona fide, in-store, former selling price.[14] The pricing signage does not suggest any comparison to Tommy Hilfiger's mainline retail stores or to third-party retailers.

35. Plaintiffs are informed and believe that the majority of Tommy Hilfiger outlet merchandise is manufactured exclusively for and sold solely at their outlet stores.[15] Subject to verification in discovery, Plaintiffs are informed and believe that Defendants' MFO[16] merchandise is made using different materials, construction methods, and/or design specifications than Tommy Hilfiger's mainline counterparts.

36. Although discovery is very much needed on this front, from their own investigation and research, Plaintiffs are informed and believe that the following non-exhaustive list includes indicia of whether a Factory Outlet item is MFO or not: (1) fabric, construction, or design elements denoting lower quality (*e.g.*, thinner

---

[14] *See Vizcarra v. Michaels Stores, Inc.*, 710 F. Supp. 3d 718, 725 (N.D. Cal. 2024) ("A reasonable consumer does not need language such as, 'Formerly $9.99, Now 40% Off $9.99,' or '40% Off the Former Price of $9.99,' to reasonably understand '40% off' to mean 40% off the former price of the product.") (quoting *Knapp v. Art.com, Inc.*, No.16-cv-00768, 2016 WL 3268995, at *4 (N.D. Cal. June 15, 2016)).

[15] *See generally Sperling v. Stein Mart, Inc.*, 291 F. Supp. 3d 1076, 1084 (C.D. Cal. 2018) ("In exclusive product cases, a store, often an outlet store, sells a lower-price, different version of a product sold in a traditional retail store. The outlet uses the price of the product made for the retail store as a comparative reference price on price tags. However, the actual product being sold in the outlet is made exclusively for the outlet and is never sold for the comparative reference price at a traditional retail store. In those cases, courts generally find that a plaintiff can proceed with his or her claims."); *see, e.g.*, *Rubenstein v. Neiman Marcus Grp. LLC*, 687 F.App'x 564, 567 (9th Cir. 2017); *Stathakos v. Columbia Sportswear Co.*, No. 15-cv-04543, 2017 WL 1957063, at *8 (N.D. Cal. May 11, 2017); *Branca v. Nordstrom, Inc.*, No. 14-cv2062, 2015 WL 10436858, at *7-8 (S.D. Cal. Oct. 9, 2015).

[16] The term "MFO" is used throughout this First Amended Complaint. To be clear, MFO—"Made-for-Outlet"—refers to products that are manufactured specifically for sale at outlet stores, rather than being originally sold at, or intended for, a brand's mainline retail stores. This is a common practice in the retail clothing industry and one that Plaintiffs have every reason to believe Defendants engage in. MFO items are often produced using different materials, construction methods, or design specifications than their mainline counterparts and may never have been offered for sale at regular retail prices or through the brand's primary sales channels—practices that Plaintiffs have every reason to believe Defendants likewise employ in the manufacturing and sale of their Tommy Hilfiger outlet merchandise.

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

materials, less lining and tailoring, shortcuts in detail, etc.); and (2) tags or labels with simplified formatting, or style numbers not traceable to mainline products.

37. Plaintiffs emphasize that whether an item sold at a Tommy Hilfiger outlet is MFO is in no way dispositive of Class membership, as consumers who purchased non-MFO items are properly included in the same class as those who purchased MFO items; liability may still attach under California consumer protection laws, as well as fraud-based common law, due to Defendants' misleading "original" pricing; deceptive comparisons to fictitious or unverified MSRPs or list prices that do not reflect recent or actual sales in mainline channels; uniform outlet signage or marketing that implies discounts from mainline retail—even where the referenced price was once used, if at all, Plaintiffs are informed and believe it reflects outdated or historically remote pricing; and omissions regarding the true nature—such as the age, condition, or discontinued status—of non-MFO items, as well as the misleading impression that such products are currently available or recently sold at mainline retail prices.

38. Additionally, because the reference prices on the outlet merchandise are styled as prior in-store prices, not market comparisons, Defendants' scheme is not a "Compare At" or "Comparable Value" pricing model. In such models, sellers explicitly invite comparison to external retailers. No such qualifier exists here (at least for the majority of the relevant time period). Consequently, Plaintiffs are not required to "assert evidence from which a rational trier of fact could infer that the comparative reference price was inaccurate," as that standard ***"only arises when the language of the advertisement implies a comparison to another retailer."***[17] Where, as here, the reference price is represented as a former in-store price, the law requires that it reflect the price at which the item was actually and regularly offered for sale.[18]

---

[17] *See Harris v. PFI W. Stores, Inc.*, No. 19-cv-192521, 2020 WL 3965022, at *4 (C.D. Cal. Apr. 9, 2020) (citing *Sperling*, 291 F.Supp.3d at 1085-86 and *Horosny v. Burlington Coat Factory of California, LLC*, No. 15-cv-05005, 2015 WL 12532178, at *6 (C.D. Cal. Oct. 26, 2015) (emphasis added).

[18] *See* Cal. Bus. & Prof. Code § 17501 (former price must be the prevailing market price within the three months immediately preceding the advertisement, unless

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

39. Plaintiffs are further informed and believe and thereon allege, that Defendants' Tommy Hilfiger outlet merchandise and pricing practices are materially identical across all Tommy Hilfiger outlet stores in California and throughout the United States. Subject to verification in discovery, Plaintiffs are informed and believe that the same MFO products are offered for sale at all such locations, and the same false reference pricing scheme—featuring inflated "original" price tags and uniform in-store discount signage—is deployed consistently across Defendants' nationwide outlet store network.

40. Because Tommy Hilfiger outlet products are rarely, if ever, offered for sale at their "original" ticket prices, the advertised discounts are fictitious. These prices serve no function other than to create a false sense of urgency and value, deceiving consumers into believing that they are purchasing high-quality goods at a substantial markdown. In reality, consumers are either purchasing lower-quality, MFO goods—often older, discontinued, or overstock items—for which the reference prices are outdated, unverified, or no longer reflect any actual or recent sales in Tommy Hilfiger's mainline retail channels. In both cases, the advertised "original" prices are misleading, and the corresponding discounts are illusory.

41. Even if Defendants were to demonstrate that some products were at one time offered at the full reference price (a disputed question of fact itself), such isolated instances would be insufficient to render the reference prices "actual" or "bona fide" under governing law.[19] Under California's FAL, a represented former price must have been the prevailing market price within the past three months, or else the advertisement

otherwise clearly stated); 16 C.F.R. § 233.1(a) (reference price must be a "bona fide" former price, meaning the price at which the product was "openly and actively offered for sale, for a reasonably substantial period of time.").

[19] For the advertised former price to be "actual, bona fide" and "legitimate" it must be the "price at which the article was offered to the public ***on a regular basis for a reasonably substantial period of time***." 16 C.F.R. § 233.1(a) (emphasis added).

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

must "clearly, exactly and conspicuously" disclose the date when that price was in effect—something Defendants consistently fail to do.[20]

42. In sum, Defendants' fake discounting practices are designed to manipulate consumer behavior, increase sales, and artificially inflate perceived product value. The scheme deprives consumers of accurate pricing information and results in the unlawful imposition of a price premium for merchandise that would not command such prices absent the false reference pricing. Plaintiffs, like thousands of other consumers, were duped into overpaying for products under the mistaken belief that they were receiving a legitimate discount.

**C. Defendants' Fraudulent Price Discounting Scheme Harms All Consumers.**

43. A product's reference price matters because it serves as the anchor from which consumers assess its value.[21] Empirical research confirms that consumers are more willing to pay higher prices when a product is presented with a higher reference price.[22] Defendants' false reference pricing causes consumers to overvalue Tommy Hilfiger outlet merchandise, leading them to pay more than they otherwise would. The products' sales prices are thus artificially inflated, not due to intrinsic value, but because Defendants have manipulated consumer perception through false comparisons. As discussed above, academic literature makes clear:

---

[20] *See* Cal. Bus. & Prof. Code § 17501. Nor would such rare offerings constitute the "prevailing market price" within the "three months next immediately preceding the publication of the advertisement," as is required by the FAL, "unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement." Indeed, where certain items are sold by only one retailer — as is the case with Defendants' MFO items, the "prevailing market price" is the most "common," "predominant," or "most widely occurring" price at which items are sold by that retailer. *See People v. Super. Ct. (J.C. Penney Corp., Inc.)*, 34 Cal. App. 5th 376, 410-13 (2019) (citing authorities).

[21] Thaler, *Mental Accounting and Consumer Choice*, *supra* note 7, at 212.

[22] Jerry B. Gotlieb & Cyndy Thomas Fitzgerald, *An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product*, 60 no 1 J. APPLIED BUS. RSCH. 66 (1990). Moreover, "if a higher reference price encourages consumers to pay a higher price for a product than the consumer was willing to pay for the identical product with a lower reference price, then the practice of using high reference prices would be deceptive." *Id*. at 60.

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

> [A]dvertised reference prices in these deal-oriented advertisements can enhance buyers' internal reference prices . . . . These enhanced internal reference prices, when compared with the lower selling price, result in higher transaction value perceptions…. [I]f sellers intentionally increase the advertised reference prices above normal retail prices… the resulting inflated perceptions of transaction value would be deceptive. Harm to both buyers and competitors could result from the effect of the inflated transaction value on buyers' search and purchase behaviors.[23]

44. All consumers who purchase Tommy Hilfiger outlet merchandise are harmed by this pricing scheme because its impact is systemic: it inflates demand and elevates actual sales prices across the board. As Staelin, *et al.*, explain, "the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." In other words, whether or not a particular consumer "believed" the discount was real is irrelevant—every purchaser paid more than they would have in a properly functioning market, and all were denied the benefit of the bargain.

45. Put differently, Defendants' fake discounting scheme causes consumers to (reasonably) perceive they are getting a bargain. This perception creates an artificial increase in what economists call "transactional utility" [24] or "transaction value"[25]—the extra satisfaction consumers derive from believing they got a deal. But that satisfaction is based on a lie. As a result, Tommy Hilfiger outlet merchandise appears more valuable than it is, skewing market demand and distorting prices.

46. Basic economic principles confirm that this harm is uniform across the Class. Cost and demand conditions—not individual subjective beliefs—dictate the price consumers pay.[26] The aggregate demand curve represents consumers' collective

---

[23] Dhruv Grewal et al., *The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions.* 62 J. OF MKTG. 46, 46 (1998) [hereinafter "Grewal et al., *The Effects of Price-Comparison Advertising*"].

[24] Thaler, *Mental Accounting and Consumer Choice*, *supra* note 7, at 205.

[25] Dhruv Grewal et al., *The Effects of Price-Comparison Advertising, supra* note 23, at 46; Grewal & Compeau, *Pricing and public policy, supra* note 12, at 7.

[26] Mankiw, N. *Essentials of Economics*, 8th Edition. Boston, MA: Cengage Learning, 66 (2015) ("[P]rice and quantity are determined by all buyers and sellers as they interact in the marketplace"); *see also* Hal R. Varian, *Microeconomics Analysis.* 3rd Edition.

valuation of a product. When Defendants' deceptive pricing inflates this valuation, the demand curve shifts outward, and prices rise for everyone, regardless of whether a particular buyer was "deceived" in a traditional sense.

47. Accordingly, Defendants' scheme artificially inflates the market price of Tommy Hilfiger outlet merchandise. Individual beliefs, motivations, or purchasing rationales do not insulate consumers from harm. As long as the aggregate demand for a falsely discounted product increases, all purchasers pay a higher price than they otherwise would. Plaintiffs and the proposed Class thus suffered a common injury caused by Defendants' uniform misconduct.

48. In addition to the above-described pricing deception, Defendants' scheme further harms consumers by causing them to overpay for inferior, outlet-specific merchandise under the mistaken belief that they are purchasing high-quality mainline products at a steep discount. Defendants offer no disclosure—either at the point of sale or on the product itself—that (on information and belief) the majority of Tommy Hilfiger outlet merchandise is manufactured exclusively for outlet sale using different materials, construction methods, and quality standards than its mainline counterparts. This omission misleads consumers into believing they are purchasing the same premium items sold at Tommy Hilfiger retail stores, when in fact they are buying lower-grade substitutes never intended for full-price sale.

49. The result is a dual injury: consumers are deceived not only about the price of the merchandise, but also about its nature and value. Believing they are securing a rare deal on high-end, mainline merchandise, consumers reasonably attribute more value to the product than it actually possesses. They are therefore deprived of the benefit of the bargain twice over—once because the purported discount is illusory, and again because the underlying product is not what it appears to be. This deception further skews consumers' valuation of Tommy Hilfiger outlet merchandise, reinforces

New York, NY: W. W. Norton & Company, at 23-38, 144-57, 233-353 & 285-312 (1992).

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

artificially high prices, and intensifies the common harm suffered by all members of the Class.

**D. Plaintiffs' Counsel's Investigation, Supported by Plaintiffs' Consulting Textile Expert, Reveals a Uniform False Pricing Scheme and Inferior Outlet Merchandise**

50. Plaintiffs' counsel has conducted a large-scale, ongoing investigation into Defendants' deceptive reference pricing practices at Tommy Hilfiger outlet stores. This investigation includes systematic in-store tracking of merchandise at California locations during the following periods: February 7, 2022, through September 23, 2022; April 18, 2024, through August 9, 2024; a separate visit on November 13, 2024; and from March 25, 2025, through July 24, 2025. Investigative visits were also conducted in Oregon and New York during parts of 2023 and 2024, but no New York or Oregon claims are currently asserted in this action.

51. Based on these efforts, Plaintiffs are informed and believe that Defendants' reference pricing scheme—*i.e.*, the manner in which "original" prices and corresponding discounts are presented—is materially uniform across all Tommy Hilfiger outlet locations, regardless of geography or time of observation. While the specific discount or reference price may vary, the scheme itself does not: all items are advertised with an inflated "original" price, followed by perpetual signage promoting a percentage-off or whole-price reduction. Not once during the investigation was a product observed being offered at its full "original" price. Plaintiffs are therefore informed and believe that Tommy Hilfiger outlet merchandise is not, as a general practice, offered for sale at its tagged price—let alone "on a regular basis for a reasonably substantial period of time," as required by FTC regulations.

52. The investigation confirms that the reference prices on Tommy Hilfiger outlet items—including those purchased by Plaintiffs—do not reflect legitimate, bona fide former prices. Rather, they serve solely as artificial anchors used to fabricate a perceived discount. Hundreds, if not thousands of products were observed as continuously "on sale" during the multi-month investigation period. This pattern

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

constitutes a pervasive, systematic, and deceptive practice at all Tommy Hilfiger outlet locations visited.[27] Indeed, Defendants' deceptive discounting scheme appeared to be executed uniformly across all Tommy Hilfiger outlet locations in California where outlet shoppers are routinely misled into believing they are purchasing premium mainline merchandise at steep discounts, when in fact they are paying inflated prices for mostly *lower-quality goods* never intended for sale in full-price retail settings.[28]

53. To further underscore that point, Plaintiffs' counsel retained a qualified textile engineering expert with more than five decades of experience in garment construction, manufacturing quality, and specification enforcement to evaluate whether apparel sold at Tommy Hilfiger outlet stores was materially inferior to equivalent items sold through Tommy Hilfiger's mainline retail channels, including major department stores such as Macy's ("Plaintiffs' Consulting Textile Expert"). He was asked to assess whether the outlet items were simply discounted surplus from mainline inventory, or whether they were, in fact, purposefully manufactured for outlet sale using lower-

[27] Notably, numerous California federal courts have held that plaintiffs in false discount pricing cases need not plead detailed pre-suit investigations to survive a motion to dismiss—even under Rule 9(b). *See, e.g., Rubenstein v. Neiman Marcus Grp. LLC*, 687 F. App'x 564, 568 (9th Cir. 2017) (plaintiff "cannot reasonably be expected" to have detailed knowledge of internal pricing policies pre-discovery; *Stathakos*, 2016 WL 1730001, at *3-4 (Rule 9(b) satisfied despite no pre-suit investigation allegations); *Knapp*, 2016 WL 3268995, at *4 ("perpetual sale" allegations sufficient); *Horosny*, 2015 WL 12532178, at *4 (upholding "information and belief" pleading*); Le v. Kohl's*, 160 F. Supp. 3d at 1099 (no nationwide investigation required).

[28] While many past courts have not required them—*see supra* note 27—other California courts have also routinely upheld complaints that ***do*** include pre-suit investigations—even less robust than Plaintiffs' here. *See, e.g., Adams v. Cole Haan, LLC*, No. 20-cv-00913, 2021 WL 4907248 (C.D. Cal. Mar. 1, 2021); *Dahlin v. Under Armour, Inc.*, No. 20-cv-3706, 2020 WL 6647733 (C.D. Cal. July 31, 2020); *Inga*, 2020 WL 5769080, at *1; *Harris*, 2020 WL 3965022, at *1; *Calderon v. Kate Spade & Co., LLC*, No. 19-cv-00674, 2020 WL 1062930 (S.D. Cal. Mar. 5, 2020); *Fisher v. Eddie Bauer LLC*, No. 19-cv-857, 2020 WL 4218228 (S.D. Cal. Feb. 3, 2020); *Dennis v. Ralph Lauren Corp.*, No. 16-cv-1056, 2017 WL 3732103 (S.D. Cal. Aug. 29, 2017); *Rael v. New York & Co., Inc.*, No. 16-cv-369, 2017 WL 3021019 (S.D. Cal. July 17, 2017); *Azimpour v. Sears, et al.*, No. 15-cv-2798, 2017 WL 1496255 (S.D. Cal. Apr. 26, 2017); *Fallenstein v. PVH Corp., et al.*, No. 21-cv-01690 (S.D. Cal. Jan. 3, 2023) at Dkt. No. 29 (Order Denying Defendants' Motion to Dismiss Plaintiff's First Amended Complaint); *Schertzer v. Alpargatas USA Inc* (Super. Ct. San Diego, 37-2019- 00015352, Dkt. No. 45).

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

quality materials or construction techniques, as part of a deceptive discount pricing scheme.

54. Plaintiffs' Consulting Textile Expert analyzed six garments: three purchased from a Macy's department store and three similar styles purchased from a Tommy Hilfiger outlet store. The pairs included: (1) tan chino slacks, (2) red polo shirts, and (3) red crew neck short-sleeve t-shirts. In two of the three categories—slacks and polos—the outlet garments were found to be inferior in both construction and material quality.[29] For instance, the Macy's tan chinos featured inner waistband piping over the overlock stitching—a labor- and materials-intensive finishing technique that adds durability and comfort. The outlet version lacked this piping and instead exposed the seam edges, indicating a clear cost-saving measure. Yet the price tags for both garments were identical at $79.50, reinforcing the illusion that the outlet product was equivalent in value.

55. Similarly, the Macy's red polo shirt was constructed from a premium 96% cotton and 4% Elastane blend and featured a traditional three-button placket, offering greater versatility and comfort. The outlet version substituted a cheaper 60% cotton / 40% polyester blend, was manufactured in a different country (India vs. Turkey), and included only a two-button placket—an intentionally cheaper design. According to Plaintiffs' expert, the outlet version was "inferior in design, aesthetics, and fit and function" and appeared "manufactured specifically for sale through Tommy Hilfiger outlet stores" rather than as discounted mainline inventory.

[29] The third category—crew neck t-shirts—did not reveal meaningful differences in quality between the mainline and outlet versions. As Plaintiffs' Consulting Textile Expert noted, this is not surprising given the inherent simplicity of the garment. Unlike more complex apparel items such as slacks or polos, which involve multiple design and construction variables (*e.g.*, fabric blends, plackets, interior finishing, structural stitching), a basic short-sleeve crew neck tee is composed of minimal components and requires relatively straightforward assembly. As a result, there are fewer opportunities for meaningful cost-cutting without altering the garment's function or appearance in obvious ways. Thus, the lack of observed disparity in this category does not undermine the broader finding that Tommy Hilfiger outlet garments are frequently of lower quality than their mainline counterparts.

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

56. In sum, Plaintiffs' Consulting Textile Expert concluded that two of the three outlet items were of demonstrably lower quality than their mainline counterparts, with measurable cost-cutting in materials, design, and manufacturing techniques. The evidence indicated that these garments were not leftover mainline goods sold at a discount, but rather garments manufactured at a lower cost specifically for retail sale at Tommy Hilfiger outlet stores.

57. Despite Plaintiffs' counsel's extensive investigative efforts, the full scope of Defendants' deceptive pricing and sourcing practices remains concealed within records exclusively in Defendants' possession. Plaintiffs will seek targeted discovery to obtain the internal data and documentation necessary to confirm the breadth and depth of Defendants' scheme.

**E. Plaintiffs' and Class Members' Economic Injuries Are Readily Quantifiable**

58. Plaintiffs have been injured and incurred quantifiable actual damages as a result of Defendants' fraudulent pricing scheme, which can be and has been preliminarily calculated through the use of regression analysis.

59. Plaintiffs overpaid for the products they purchased as described herein. And it was Defendants' false reference pricing scheme and attendant deception that caused Plaintiffs to overpay. Despite Plaintiffs' original belief that the products they purchased were discounted and thus, that their value was significantly greater than the sale price for which they purchased them, Plaintiffs, in actuality, paid an *inflated* price for all of the supposedly discounted products they purchased. In other words, both the reference prices and the actual selling prices of the items Plaintiffs purchased were inflated, but for different reasons: the reference prices because Defendants intentionally fabricated them and the actual selling prices because if Defendants had not engaged in the false discounting scheme, then those items would not have commanded such high, *i.e.*, *inflated*, prices. Thus, the items Plaintiffs purchased were all worth less than the amounts they paid for them.

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

60. Plaintiffs were damaged in their purchases because Defendants' false reference price discounting scheme inflated the final selling price of the items they purchased, such that Defendants' false reference price discounting scheme caused Plaintiffs to pay a price premium. Defendants' false reference price discounting scheme artificially inflated consumer demand, such that each consumer who purchased the corresponding product paid higher prices when compared to what they would have paid had Defendants not engaged in a false reference pricing scheme. Plaintiffs would not have purchased the merchandise, or would have paid less for it, but for Defendants' representations regarding the false reference prices and purported discounts of the merchandise. Plaintiffs were misled into believing that they were receiving substantial savings on the purchase of Defendants' products, which was implied by the falsely advertised reference prices.

61. Here, for purposes of investigation and determining a preliminary measure of damages, Plaintiffs, with the assistance of qualified expert economists and consultants, conducted an analysis of Defendants' product SKUs and pricing practices attached to each SKU. Plaintiffs, through the use of sophisticated regression analysis, were able to determine the objective measure by which Plaintiffs and Class members overpaid for the goods they purchased.[30]

62. Reference guides on regression-based damages describe how "[p]ractitioners can use several tools to establish and measure relations among the variables that affect revenues and costs, and thus establish the causal link . . . Regression analysis applies a statistical technique to develop an equation depicting the

[30] Notably, if the "misrepresentation ... artificially inflate[s] the market price of a product, causing [Plaintiffs] to pay more for it than [they] otherwise would have—regardless of whether [they] even saw the misrepresentation," the Plaintiffs were "harmed [ ] by a misrepresentation without necessarily having relied on it." *In re AXA Equitable Life Ins. Co. COI Litig*., No. 16-cv-740, 2020 WL 4694172, at *10 (S.D.N.Y. Aug. 13, 2020). Under this "theory of causation … that the advertising and labeling practice allowed a price premium to be charged" is often known as a "market-price-based theory of causation." *Id.* at *11 (citation and internal quotation marks omitted). This theory, "unlike the promise-based theory, does not depend on the consumer's awareness of the representation." *Id.*

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

relation among variable and then uses that equation for prediction."[31] In this case, Plaintiffs' consultants utilized regression analysis to estimate the relationship between Defendants' reference prices and Defendants' selling prices, after accounting for the other factors that influence Defendants' pricing, and used that equation to predict prices that would have occurred but for the misconduct in this case. As explained below, the regression analysis relies on Defendants' data and measures how selling prices increase when the intensity of their misconduct is greater (*i.e.*, a higher reference price leads to higher selling price, holding all else equal).

63. Plaintiffs' experts used the data collected during the investigation to analyze 113 products offered for sale within Defendants' Tommy Hilfiger outlet stores during the Class Period (defined below). The average reference price within this data sample was $74.40, whereas the average selling price was $47.90. Thus, on average, the reference price chosen by Defendants was $26.50 (or 55.3% higher) than the selling price.

64. Plaintiffs' experts used this data to perform a regression model which allowed them to calculate the price premium paid by Plaintiffs and all similarly situated proposed Class members for each product purchased. The regression model incorporates supply and demand factors through the use of *actual selling prices*, which are the net result of the competitive factors that influence Defendants' pricing. For example, the price of an item at issue in this case is a function of its component features (*e.g.*, is the item a dress, top, or jacket? Is the item marketed towards women or men?). The net effect of the demand factors (*e.g.*, consumer willingness to pay for an item based on its features) and supply factors (*e.g.*, Defendants' product costs) are captured within the product's attributes when actual selling prices are used in this type of regression analysis.

[31] Roman L. Weil et al., *Litigation Services Handbook: The Role of the Financial Expert*, Ch. 4, p. 25 (6th ed. 2017).

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

65. While additional variables will be accounted for after more detailed data is provided during discovery, ***this initial regression analysis already accounts for nine variables that impact Defendants' pricing*** (including reference price). For example, the regression analysis accounts for broad product type (*e.g.*, bottoms vs. tops vs. dresses vs. outerwear) and target gender demographic (*e.g.*, women, men, girls, or boys).

66. After accounting for these product characteristics, the regression finds that increasing the reference price by $1 results in an increase of approximately $0.58 in the selling price of items at Tommy Hilfiger outlet stores.

67. The corresponding regression equation is then used to predict selling prices if the reference price was reduced to the typical selling price of the item (*i.e.*, lowering the reference price to remove the impact of Defendants' misconduct on pricing). For example, as previously discussed, the preliminary data suggests that Defendants' reference prices were $26.50 (or 55.3% higher) than the selling price, on average. When combined with the preliminary regression results described above, this $26.50 differential implies that selling prices were approximately $15.37 higher, on average, due to the false discounting scheme alleged in this case.[32] This average overcharge of $15.37 represents approximately 32.1% of the average purchase price within the data collected by Plaintiffs.[33]

68. These results will be revised upon receipt of documents and data during discovery, but the data suggests that Plaintiffs and all others similarly situated paid a price premium as a result of the alleged misconduct. Plaintiffs will seek in-depth discovery of internal documents, digitally stored historic pricing data, and depositions of persons most knowledgeable about Defendants' practices to supplement this investigation, show common injury at class certification, and prove damages with reasonable certainty at trial.

---

[32] That is, $26.50 x 0.58 = $15.37.

[33] That is, $15.37 / $47.90 = 32.1%

69. The table below shows the application of the preliminary regression coefficient (0.58) to the items purchased by Plaintiffs and the resulting measure of injury.[34]

| **Item** | **Delta (Δ) Between Reference and Sale Price** | **Coefficient (0.58)** | **Damages (Δ x 0.58)** |
|---|---|---|---|
| Plaintiff De La Paz's Signature Core T-Shirt | $11.27 | 0.58 | $6.54 |
| Plaintiff De La Paz's Tommy Tipped Polo Shirt | $29.51 | 0.58 | $17.12 |
| Plaintiff Hashimi's Sweatpants | $40 | 0.58 | $23.20 |
| Plaintiff Hashimi's Polo Shirt | $36.50 | 0.58 | $21.17 |

70. The harm to Plaintiffs and Class members (*i.e.*, price premium) caused by Defendants' misconduct can also be objectively measured through the use of conjoint analysis supported by Defendants' historic pricing, sales, and other market data, which will also be pursued vigorously in discovery, to isolate the price premium associated with Defendants' false reference price and discounting scheme.

71. Conjoint analysis is a well-accepted survey-based technique in which survey participants select their most preferred product from a series of product options with different attributes (including price).[35] The researcher will then analyze

[34] This exercise can be performed for every product Defendants have sold at Tommy Hilfiger stores at a purported discount by multiplying the regression coefficient by that item's reference price/sales price differential. Once enough historical pricing and sales data is provided to Plaintiff's experts to perfect the regression coefficient, measuring the harm to each Class member will be a simple mechanical exercise.

[35] "The key characteristic of conjoint analysis is that respondents evaluate product profiles composed of multiple conjoined elements (attributes or features). Based on how respondents evaluate the combined elements (the product concepts), we deduce the preference scores that they might have assigned to individual components of the product that would have resulted in those overall evaluations." (Orme, B. "A Short History of Conjoint Analysis," ch. 4 in *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*, Madison, WI: Research Publishers LLC, p. 29 (2d ed. 2010).



LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

consumers' trade-offs among products with different features using a statistical model that allows the researcher to estimate the influence of each product attribute and the willingness-to-pay ("WTP") for a particular product attribute. In other words, conjoint analysis can establish the extent to which consumer preferences (*i.e.*, consumer demand or WTP) change due to the alleged misconduct (*i.e.*, false reference and discounting scheme) and further, quantify its monetary impact on actual selling prices. After measuring the change in consumer preferences (and WTP) due to the alleged misconduct in this case, an overcharge is then calculated by then incorporating *supply*-side behavior.

72. As with hedonic regression, Plaintiffs can put forth an expert-based conjoint analysis with and/or without an economic market simulation to account for supply side factors[36] that will likewise demonstrate the price premium paid on products with inflated reference prices as compared to those without inflated reference prices. This approach will isolate the economic harm to Class members due solely to

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

[36] An economic market simulation estimates market prices by fully incorporating the relevant supply and demand information to estimate the but-for market prices that would have been paid by consumers in the absence of the alleged misconduct. It is used to incorporate supply side factors into the but-for world in which consumers' WTP has adjusted due to the absence of the alleged misconduct. Market simulations often incorporate (and are calibrated to) real-world supply and demand market data on the Defendants' (and competitor's) products, prices, costs, market share, consumer decisions (*e.g.*, mixed logit coefficients from conjoint analysis), and the price elasticity of consumer demand. Indeed, a wide body of academic literature in the economics discipline describes combining the consumer demand side of the market with the supply side of the market to determine market equilibrium prices. For example, Steven Berry, et al., *Automobile Prices in Estimation of Random-Coefficients Logit Models of Demand*, 9 Journal of Economic and Management Strategy 513-548 (2000); Steven Berry, et al., *Differentiated Products Demand Systems from a Combination of Micro and Macro Data: The New Car Market*, 112 J. Political Economy 68-105 (2004); Amil Petrin, *Quantifying the Benefits of New Products: The Case of the Minivan*, 110 J. Political Economy 705-29 (2002); Greg Allenby, et al., *Valuation of Patented Product Features*, 57 J. Law & Economics 629-63 (2014). Within the context of consumer class action litigation, various courts have accepted damages models based on economic market simulations that incorporate the findings of a conjoint analysis with additional supply-side factors. See, e.g., *Won v. General Motors, LLC*, No. 19-cv-11044 (E.D. Mich. July 28, 2022); *Allegra v. Luxottica Retail North America*, No. 17-cv-5216 (E.D.N.Y. Dec. 13, 2021); *Johannessohn v. Polaris Industries, Inc.*, No. 16-cv-03348 (D. Minn. Mar. 31, 2020) ("There is no question that a market simulation is a scientifically valid method to determine the market equilibrium price in a counterfactual world.").

Defendants' misconduct and will demonstrate that otherwise identical products sold *without* reference prices ultimately cost less.

73. Accordingly, objective measures demonstrate that Plaintiffs overpaid for the Tommy Hilfiger outlet store merchandise they purchased. The difference between the actual sale price paid by Plaintiffs due to the artificially increased demand for the products—caused by Defendants' false discounting scheme—and the market sale price that the products would have commanded without Defendants' misconduct provides an objective measure by which Plaintiffs were overcharged and injured by Defendants. The amount of inflation of the prices for the Tommy Hilfiger outlet store merchandise Plaintiffs purchased as a result of Defendants' deception measures how much Plaintiffs overpaid. As shown above, this amount can be quantified using regression analysis based on Defendants' historic pricing data and/or through conjoint analysis (with or without a market simulation).

74. Plaintiffs submit that the methodologies discussed herein are commonly accepted by courts in consumer class actions and are capable of being applied using class-wide data, making damages analyses in this action manageable and suitable for common proof.

**F. Plaintiffs Face a Threat of Future Recurring Harms and Lack an Adequate Remedy at Law**

75. Plaintiffs do not have an adequate remedy at law, and are susceptible to recurring harm because they like the merchandise sold at Defendants' brick-and-mortar stores. Plaintiffs desire to continue purchasing additional items from Defendants in the future. However, Plaintiffs are unable to discern which reference prices are inflated and untrue from truthful reference prices. Plaintiffs may again, by mistake, purchase products with false reference prices and discounts in the future based on the reasonable, but incorrect, impression that the advertised reference prices are honest, accurate, and bona fide. Plaintiffs have no reasonable means to determine in the future whether Defendants are continuing to use false reference prices and discounts, or whether they

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

have ceased this deceptive practice, and are therefore susceptible to recurring harm in the immediate future.

76. Absent an equitable injunction enjoining Defendants from implementing an unlawful false price-discounting scheme, Plaintiffs, members of the putative Class, and the general public will be irreparably harmed and denied an effective and complete remedy because of the real and tangible threat of future harm emanating from Defendants' ongoing and deceptive conduct that cannot be remedied with monetary damages. Accordingly, Plaintiffs, members of the putative Class, and the general public lack an adequate remedy at law, and an injunction is the only form of relief that will guarantee them the appropriate redress and assurances.

77. Moreover, Plaintiffs lack an adequate remedy at law with respect to their claims seeking equitable restitution because they have not yet retained an expert to determine whether an award of damages can or will adequately remedy their monetary losses caused by Defendants. Particularly, as legal damages focus on remedying the loss to the Plaintiffs, and equitable restitution is concerned with money wrongfully obtained by Defendants. Furthermore, Plaintiffs will seek to establish damages under various theories, such as the "purchase price," "price premium," and/or "benefit-of-the-bargain" theories, all of which can yield different sums of damages.[37]

78. Plaintiffs have standing to seek injunctive relief because they face a real and substantial risk of future harm, absent judicial intervention. Plaintiffs regularly shop at Tommy Hilfiger outlet stores and have a continued interest in doing so given their preference for the brand and its styles. However, they are unable to determine

[37] The purchase price theory allows a plaintiff to recover what they paid for the product, essentially a full refund. The price premium theory utilizes regression analyses to determine the outward shift of the demand curve of Defendants' merchandise due to the false price-discounting scheme, and thus the increase in price as a result of the surge in demand, the amount of which can be recovered as damages. Lastly, the benefit-of-the-bargain theory calculates the difference between the value represented (reference price) and the actual value received, which can be recovered as damages. Without expert analysis to determine the outward shift in the demand curve or the actual value received, Plaintiff does not know at the pleading stage, especially before the benefits of discovery, whether legal damages or equitable restitution would adequately remedy Plaintiffs' and the putative Class's monetary losses.

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

with any reliability whether Defendants have ceased the deceptive reference pricing practices challenged herein. The nature of outlet shopping—characterized by rapid product turnover, fluctuating inventory, and changing promotional signage—makes it virtually impossible for Plaintiffs to discern whether a particular product's reference price is legitimate or deceptive. Plaintiffs are not trained pricing auditors, nor do they have access to Defendants' internal pricing histories. Without injunctive relief, Plaintiffs remain at serious risk of being deceived again.

79. Defendants' widespread and opaque use of fictitious reference pricing exacerbates the difficulty consumers face in distinguishing between legitimate markdowns and false price comparisons. Given the volume and diversity of Tommy Hilfiger outlet merchandise, and the fact that Defendants may at any time introduce new MFO products using similar deceptive reference pricing, there is a substantial likelihood that Plaintiffs will again be misled in future purchases—even if unintentionally. Plaintiffs should not be required to launch an independent investigation into Defendants' pricing structure before each visit to a Tommy Hilfiger outlet store. Injunctive relief is necessary to ensure that future purchases are not tainted by the same misrepresentations that harmed them before.

80. Plaintiffs, the Class, and the general public will suffer irreparable harm absent an injunction barring Defendants from continuing their deceptive pricing practices. Monetary damages cannot police future misconduct or restore marketplace integrity, as they are limited to compensating past harm and do not proactively restrain unlawful conduct. Any deterrent effect is speculative and may be disregarded altogether—particularly where, as here, a company may rationally choose noncompliance if the cost of reform exceeds its expected liability. Injunctive relief is uniquely suited to prevent the recurrence of deceptive pricing schemes that are inherently difficult to detect without greater transparency.

81. Indeed, courts routinely recognize that deceptive pricing harms not only past purchasers but also future consumers who rely on similar representations in

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

making purchase decisions. An injunction is therefore necessary to prevent ongoing violations and ensure meaningful consumer protection. Plaintiffs lack an adequate remedy at law because no amount of damages can ensure that Defendants' future pricing representations will comply with state and federal law.

82. Plaintiffs also lack an adequate remedy at law for purposes of seeking equitable restitution. Under *Sonner*, Plaintiffs must plead facts showing that legal damages are inadequate—and they do. At this stage, Plaintiffs have not yet retained a damages expert to determine whether legal damages (such as out-of-pocket loss or benefit-of-the-bargain measures) will fully compensate for the monetary harm they suffered. Unlike legal damages, equitable restitution focuses on disgorging ill-gotten gains and restoring money wrongfully obtained by Defendants through their uniform scheme. There is no certainty at this juncture that a legal remedy will be available, quantifiable, or coextensive with equitable relief. Accordingly, Plaintiffs may properly plead both in the alternative.

83. In particular, Plaintiffs—purchasers of Tommy Hilfiger outlet merchandise in California—lack an adequate ***legal*** remedy for any injury measured under the "value represented minus price paid" theory (*i.e.*, the benefit-of-the-bargain). California law prohibits recovery of such damages under fraud or CLRA legal damages theories, but ***may permit*** this measure of relief through equitable restitution. *See* Cal. Civ. Code § 3343. Equitable restitution thus offers a distinct avenue of redress where legal relief may fail.[38]

84. Furthermore, the UCL's four-year statute of limitations extends one full year beyond the three-year limitation period applicable to CLRA claims. *See* Cal.

---

[38] Decisions in numerous false discounting cases have accepted similar allegations where the defendant has challenged the plaintiffs' ability to seek equitable relief following the decision in *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 22020). *See, e.g.*, *Dahlin*, 2020 WL 6647733, at *4-5; *Adams*, 2021 WL 4907248, at *3-4 (C.D. Cal. Mar. 1, 2021); *Fallenstein*, No. 21-cv-01690 (S.D. Cal. Jan. 3, 2023) at Dkt. No. 29 (Order Denying Defendants' Motion to Dismiss Plaintiff's First Amended Complaint). *Dahlin v. The Donna Karan Co. Store, LLC*, No. 21-cv-07711 (C.D. Cal. Mar. 16, 2022) at Dkt. No. 30 (Order Denying Motion to Dismiss Plaintiff's First Amended Complaint) at 5-10.

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

Bus. & Prof. Code § 17208; Cal. Civ. Code § 1783. If Plaintiffs' (equitable) UCL claims were dismissed on the theory that legal damages were adequate, a full year of monetary relief would be lost, despite clear allegations of continuing harm. Such a result would contravene public policy and the remedial goals of the UCL.

85. Finally, Plaintiffs' UCL claims—particularly those brought under the "unfair" prong—reach conduct that legal remedies under the CLRA do not. *See Allen v. Hylands, Inc.*, 773 F. App'x 870, 874 (9th Cir. 2019). While the CLRA is generally limited to fraud-based consumer deception ("reasonable consumer" test), the UCL's unfairness standard encompasses a broader set of harms, including practices that violate established public policy or that are immoral, unethical, oppressive, or unscrupulous. The ability to plead this theory is critical to capturing broader marketplace injuries that legal claims may not address—and thus further illustrates why Plaintiffs lack an adequate remedy at law and are entitled to purse equitable claims in the alternative.

## V. CLASS ALLEGATIONS

86. Plaintiffs bring this action on behalf of themselves and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seek certification of the following Class against Defendants:

> All persons who, within the State of California and within the applicable statute of limitations preceding the filing of this action (the "Class Period"), purchased from a Tommy Hilfiger outlet store one or more products at discounts from an advertised reference price and who have not received a refund or credit for their purchase(s).

87. Excluded from the Class are Defendants, as well as their officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of their respective officers, employees, agents or affiliates, and any judge who presides over this action. Plaintiffs reserve the right to expand, limit, modify, or amend this Class definitions, including the addition of one or more class, in connection with their motion for Class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

88. ***Numerosity***: The Class members are so numerous that joinder of all members is impracticable. Plaintiffs are informed and believe that the proposed Class contain hundreds of thousands of individuals who have been damaged by Defendants' conduct as alleged herein. The precise number of Class members is unknown to Plaintiffs.

89. ***Existence and Predominance of Common Questions of Law and Fact***: This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

a. whether, during the Class Period, Defendants used false advertised reference prices on their Tommy Hilfiger outlet product labels and falsely advertised price discounts on merchandise sold in their outlet stores;

b. whether Defendants ever offered items for sale or sold items at their advertised reference price;

c. whether, during the Class Period, the original price advertised by Defendants was the prevailing market price for the products in question during the three months preceding the dissemination and/or publication of the advertised former prices;

d. whether, during the Class Period, any of the original prices advertised by Defendants were false or misleading;

e. whether Defendants' purported sale prices advertised in their Tommy Hilfiger outlet stores reflected any actual discounts or savings;

f. whether Defendants' purported percentage-off discounts advertised in their Tommy Hilfiger outlet stores reflected any actual discounts or savings;

g. whether Defendants' alleged conduct constitutes violations of the laws asserted;

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

h. whether Defendants' alleged conduct constitutes violations of federal and/or California pricing regulations;

i. whether Defendants engaged in an unconscionable commercial practice, and/or employed deception or misrepresentation under the laws asserted;

j. whether Plaintiffs and Class members are entitled to damages and the proper measure of that loss; and

k. whether an injunction is necessary to prevent Defendants from continuing to use false, misleading or illegal price comparisons.

90. ***Typicality***: Plaintiffs' claims are typical of the claims of the Class members because, *inter alia*, all Class members have been deceived (or were likely to be deceived) by Defendants' false and deceptive price advertising scheme, as alleged herein. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all Class members.

91. ***Adequacy***: Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no antagonistic or adverse interests to those of the Class.

92. ***Superiority***: The nature of this action and the nature of laws available to Plaintiffs and the Class make the use of the class action format a particularly efficient and appropriate procedure to afford relief to them and the Class for the wrongs alleged. The damages or other financial detriment suffered by individual Class members is relatively modest compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for Plaintiffs and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Absent the class action, Class members and the general public would not likely recover, or would not likely have the chance to recover, damages or restitution, and Defendants will be permitted to retain the proceeds of their fraudulent and deceptive misdeeds.

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

93. All Class members, including Plaintiffs, were exposed to one or more of Defendants' misrepresentations or omissions of material fact claiming that former reference prices advertised prices were legitimate. Due to the scope and extent of Defendants' consistent false sale prices, and advertising scheme, disseminated in a years-long campaign to California consumers, it can be reasonably inferred that such misrepresentations or omissions of material fact were uniformly made to all members of the Class. In addition, it can be reasonably presumed that all Class members, including Plaintiffs, affirmatively acted in response to the representations contained in Defendants' false advertising scheme when purchasing merchandise sold at Tommy Hilfiger outlet stores.

94. Plaintiffs are informed that Defendants keep extensive computerized records of their Tommy Hilfiger outlet customers through, *inter alia*, customer loyalty programs, credit card programs, and general marketing programs. Defendants have one or more databases through which a significant majority of Class members may be identified and ascertained, and they maintain contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of California's False Advertising Law ("FAL")
### CAL. BUS. & PROF. CODE §§ 17500, *et seq.*

95. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-94 as if fully set forth herein.

96. Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants for violations of California's FAL, Cal. Bus. & Prof. Code §§ 17500, *et seq*.

97. Cal. Bus. & Prof. Code § 17500 provides:

> It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of . . . personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

> to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that . . . personal property or those services . . . which is ***untrue or misleading***, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . .

(emphasis added).

98. The FAL further provides:

> No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price . . . within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.

Cal Bus. & Prof. Code § 17501.

99. Defendants' routine practice of advertising discounts from false ticket prices, which are not and never have been the prevailing market prices of those products and were materially greater than the true prevailing prices (*i.e.*, Defendants' average and/or most common actual sale price), constitutes an unfair, untrue, and misleading practice in violation of the FAL. This deceptive marketing practice gave consumers the false impression that the products were regularly sold on the market for a substantially higher price than they actually were; therefore, leading to the false impression that the products sold by Defendants are worth more than they actually are.

100. As a direct and proximate result of Defendants' misleading and false advertisements, as well as Defendants' deceptive and unfair acts and practices made during the course of Defendants' business, Plaintiffs and members of the Class suffered economic injury.

101. Plaintiffs, on behalf of themselves and the Class, request that this Court order Defendants to restore this money to Plaintiffs and the Class, and to enjoin Defendants from continuing these unfair practices in violation of the FAL in the future. Otherwise, Plaintiffs, members of the Class, and the broader general public will be irreparably harmed and/or denied an effective and complete remedy.

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

## SECOND CAUSE OF ACTION
## Violation of California's Unfair Competition Law ("UCL")
## CAL. BUS. & PROF. CODE §§ 17200, *et seq.*

102. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-94 as if fully set forth herein.

103. Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendants for violations of the UCL, Cal. Bus. & Prof. Code §§ 17200, *et seq*.

104. The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200.

105. The UCL imposes strict liability. Plaintiffs and members of the proposed Class need not prove that Defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

***"Unfair" Prong***

106. A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

107. Defendants' actions constitute "unfair" business practices because, as alleged above, Defendants engaged in misleading and deceptive price comparison advertising that represented false reference prices and corresponding deeply discounted phantom "sale" prices. Defendants' acts and practices offended an established public policy of transparency in pricing, including regulations enacted by the FTC, and they constituted immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

108. The harm emanating from this practice to Plaintiffs and members of the proposed Class outweighs any utility it provides because Defendants' practice of

advertising false discounts provides no utility. There were reasonably available alternatives to further Defendants' legitimate business interests other than the misleading and deceptive conduct described herein.

***"Fraudulent" Prong***

109. A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

110. Defendants' acts and practices alleged above constitute fraudulent business acts or practices as Defendants have deceived Plaintiffs and members of the proposed Class and are highly likely to deceive members of the consuming public. Plaintiffs and members of the proposed Class relied on Defendants' fraudulent and deceptive representations regarding their false ticket prices for products sold by Defendants. These misrepresentations played a substantial role in Plaintiffs' and members of the proposed Class's decision to purchase products at a purportedly steep discount, and Plaintiffs and members of the proposed Class would not have purchased products without Defendants' misrepresentations.

***"Unlawful" Prong***

111. A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

112. Defendants' acts and practices alleged above constitute unlawful business acts or practices as Defendants have violated state and federal law in connection with their deceptive pricing scheme. The FTCA prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). Under the FTC, false former pricing schemes, like Defendants', are described as deceptive practices that violate the FTCA:

> (a) One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

> advertised is not bona fide but fictitious - ***for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction - the "bargain" being advertised is a false one***; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price
>
> (b) A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith - and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based. And the advertiser should scrupulously avoid any implication that a former price is a selling, not an asking price (for example, by use of such language as, "Formerly sold at $______"), unless substantial sales at that price were actually made.

16 C.F.R. § 233.1(a) and (b) (emphasis added).

113. In addition, Defendants' acts and practices violate California law, which expressly prohibits false former pricing schemes. The FAL, Cal. Bus. & Prof. Code § 17501, entitled "*Worth or value; statements as to former price*," states:

> For the purpose of this article the worth or value of any thing advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.
>
> No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.

Cal. Bus. & Prof. Code § 17501 (emphasis added).

114. Defendants violate § 17501 because they advertise items, including the items that Plaintiffs purchased and are described herein, with a former price that greatly exceeds the prevailing market price of those items. For the most part, Defendants advertise on their price tags a reference price that is unadorned by any qualifying language (*e.g.*, "Compare At") which could arguably put consumers on notice to review prices outside of the Tommy Hilfiger outlet store.

115. In doing so, Defendants reasonably convey to consumers that these reference prices represent their *own* former price for that same merchandise. *See supra*

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

note 14 (citing *Vizcarra*, 710 F.Supp.3d at 725). Accordingly, the "prevailing" market price of those items can be measured exclusively by reference to Defendants' own historical sales data. *See Harris*, 2020 WL 3965022, at *4 (the need for allegations pertaining to a false discounting plaintiff's counsel's investigation of outside market "***only arises when the language of the advertisement implies a comparison to another retailer***.") (emphasis added); *see* ¶ 34.

116. Thus, Defendants' internal sales data need only be reviewed to ascertain the "prevailing" market prices for the products at issue in this case. *See People v. Super. Ct. (J.C. Penney Corp., Inc.)*, 34 Cal.App.5th 376, 410-13 (2019) (the "prevailing market price" is the most "common," "predominant," or "most widely occurring" price at which items are sold) (citing authorities).

117. As detailed in the Third Cause of Action below, the CLRA, Cal. Civ. Code § 1770(a)(9), prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," and subsection (a)(13) prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions."

118. As detailed herein, and for the same reason that Defendants' acts and practices violate the FTCA and the FAL, they also violate the CLRA, thus establishing another "unlawful" act in violation of the UCL.

119. Defendants' practices, as set forth above, misled Plaintiffs, the Class, and the public in the past and will continue to mislead them in the future. Consequently, Defendants' practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

120. Defendants' violations of the UCL, through unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat to Plaintiffs, members of the Class, and the public who, if Defendants' false pricing scheme is permitted to continue, will be deceived into purchasing products based on illegal price comparisons. These false comparisons lead to artificial and increased demand, which in

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

turn, leads to higher prices and financial harm for consumers like Plaintiffs and the members of the Class as described herein. Because of the surreptitious nature of Defendants' deception, these injuries cannot be reasonably avoided and will continue to be suffered by the consuming public absent a mandated change in Defendants' practice.

121. Pursuant to Bus. & Prof. Code § 17203, Plaintiffs and members of the Class are entitled to preliminary and permanent injunctive relief enjoining Defendants from continuing to engage in this unfair competition alleged above, as well as disgorgement and restitution to Plaintiffs and the Class of all Defendants' revenues wrongfully obtained from them as a result of Defendants' unfair competition, or such portion of those revenues as the Court may find equitable.

## THIRD CAUSE OF ACTION
### Violation of California's Consumers Legal Remedies Act ("CLRA")
### CAL. CIV. CODE § 1750, *et seq.*

122. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-94 as if fully set forth herein.

123. Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants for violations of the CLRA, Cal. Civ. Code § 1750, *et seq*.

124. Plaintiffs and each member of the Class are "consumers" as defined by Cal. Civ. Code § 1761(d). Defendants' sale of products were "transactions" within the meaning of Cal. Civ. Code § 1761(e). The products purchased by Plaintiffs and members of the Class are "goods" or "services" within the meaning of Cal. Civ. Code § 1761(a)-(b).

125. Defendants violated and continue to violate the CLRA by engaging in the following practices proscribed by Cal. Civ. Code § 1770(a) in transactions with Plaintiffs and the Class, which were intended to result in, and did result in, the sale of products sold at their Tommy Hilfiger outlet stores:

a. advertising goods or services with intent not to sell them as advertised; § 1770(a)(9); and

LYNCH CARPENTER
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

b. making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions; § 1770(a)(13).

126. Plaintiffs and the Class are consumers who have suffered economic injury and damages, including benefit of the bargain damages, as a result of Defendants' use and employment of the false and misleading reference pricing alleged herein. Pursuant to Cal. Civ. Code § 1780(a), Plaintiffs therefore seek an award of damages, including actual, punitive, and statutory damages, an order enjoining such methods, acts, or practices, as well as any other relief the Court deems proper. Plaintiffs additionally seek costs and reasonable attorney's fees pursuant to Cal. Civ. Code § 1780(e).

127. On August 28, 2026, Plaintiffs, through counsel, served CLRA demand letters on Defendants by certified mail that provided notice of Defendants' violations of the CLRA as alleged herein, and demanded that Defendants notify all members of the Class and correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and deceptive practices complained of herein. More than 30 days have passed since Defendants were served with those CLRA demand letters, and Defendants have not complied with any of the demands in those CLRA demand letters.

## VII. PRAYER FOR RELIEF

Wherefore, Plaintiffs, on behalf of themselves and on behalf of the other members of the Class, request that this Court award relief against Defendants as follows:

1. an order certifying the Class and designating Plaintiffs as the Class Representatives, and their counsel as Class Counsel;

2. awarding restitution and disgorgement of all profits and unjust enrichment that Defendants obtained from Plaintiffs and the Class members as a result of their unlawful, unfair, and fraudulent business practices described herein;

3. awarding declaratory and injunctive relief as permitted by law or equity, including: preliminarily and permanently enjoining Defendants from continuing the unlawful practices as set forth herein, and directing Defendants to identify, with Court supervision, victims of their misconduct and pay them all money they are required to pay;

**LYNCH CARPENTER**
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
619.762.1910

4. retaining jurisdiction to monitor Defendants' compliance with permanent injunctive relief;

5. awarding any damages, including actual, punitive, and statutory damages as permitted under the CLRA;

6. ordering Defendants to engage in a corrective advertising campaign;

7. awarding attorneys' fees and costs;

8. for leave to amend these pleadings to conform to evidence adduced at trial; and

9. for such other and further relief as the Court may deem necessary or appropriate.

## VIII. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

Dated: October 2, 2026

**LYNCH CARPENTER, LLP**

By: */s/ Todd D. Carpenter*

Todd D. Carpenter (SBN 234464)
*todd@lcllp.com*
Scott G. Braden (SBN 305051)
*scott@lcllp.com*
James B. Drimmer (SBN 196890)
*jim@lcllp.com*
Ethan Ames (SBN 339027)
*ethan@lcllp.com*
Christopher L. Cornelius (*pro hac vice* forthcoming)
*chris@lcllp.com*
**LYNCH CARPENTER, LLP**
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
Tel.: 619.762.1910

*Counsel for Plaintiffs and the Proposed Class*